IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CHARLES P. TURNER, | ) | CIV. NO. 14-00306 BMK |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING |
| | ) | DEFENDANTS' MOTIONS FOR |
| vs. | ) | SUMMARY JUDGMENT |
| | ) | |
| ASSOCIATION OF APARTMENT | ) | |
| OWNERS OF WAILEA POINT | ) | |
| VILLAGE, ROBERT READER, | ) | |
| individually and as Resident Manager | ) | |
| of ASSOCIATION OF | ) | |
| APARTMENT OWNERS OF | ) | |
| WAILEA POINT VILLAGE, | ) | |
| DARRYL JOHNSON, individually | ) | |
| and as Security Supervisor of | ) | |
| ASSOCIATION OF APARTMENT | ) | |
| OWNERS OF WAILEA POINT | ) | |
| VILLAGE, DOES 1-10; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Before the Court are Defendants Robert Reader and Darrell Johnson's

Motion for Summary Judgment (Doc. 50) and Defendant Association of Apartment

Owners of Wailea Point Village's (the "AOAO") Motion for Summary Judgment

(Doc. 52) (collectively, "Defendants' Motions").  On February 25, 2016, the Court

heard Defendants' Motions.  Peter C. Hsieh appeared at the hearing on behalf of

Plaintiff Charles P. Turner ("Plaintiff"); Anna M. Elento-Sneed and Landon J.M.

Yun appeared at the hearing on behalf of Defendants.  After reviewing the motions

and the supporting and opposing memoranda, and having heard the arguments of

counsel, Defendants' Motions are granted.

## BACKGROUND

On August 30, 2006, the AOAO hired Plaintiff as a Patrol Officer.

Patrol Officers are generally required to guard residential property against fire,

theft, vandalism, and illegal entry by performing various patrol, inspection, and

observation duties.  Patrol Officers are expected to comply with the AOAO's

policies and procedures.  Patrol Officers are further required to complete daily

activity reports, which are detailed logs of the Patrol Officer's work-related

activities during the shift.  Patrol Officers also complete incident reports, which

document noteworthy events.  Questions, personal opinions, suggestions, and other

internal employee issues or problems must be submitted directly to management,

and not incorporated into daily activity reports or incident reports.

During Plaintiff's employment with the AOAO, Defendant Darrell

Johnson was Plaintiff's immediate supervisor.  Defendant Johnson reported to

AOAO Resident Manager, Robert Reader, who in turn reported to the AOAO

Board of Directors.  Generally, the AOAO's Patrol Department has three shifts:

day shift, swing shift, and graveyard shift.  Plaintiff was hired for the graveyard

shift.  The primary function of the graveyard shift is to confirm that everything is

secured and no inappropriate activity takes place.  The graveyard shift patrol

officers sit in the kiosk or patrol the property in a golf cart, check unoccupied unit

doors, and lock pool facilities.

On July 18, 2010, Plaintiff reported a left foot work injury that

required him to stay out of work through February 2011.  At the time of Plaintiff's

work injury, Plaintiff worked the 11:00 p.m. to 7:00 a.m. graveyard shift and was

given Mondays and Tuesdays off.

Pursuant to a Disability Certificate dated January 27, 2011, issued by

Plaintiff's Podiatric Physician Dr. Douglas Birch, Plaintiff was permitted to return

to work on February 16, 2011 with the following limitations:

NO standing over 2 hrs. per day

NO lifting over 10 pounds

NO walking over 2 hrs. per day

NO working over 8 hrs. per day

Special Instructions:  Minimal ascending [and] descending of stairs.
Avoid walking on inclinations.  Please allow patient to elevate foot as
much as possible.

(Doc. 53-10 at 276 (format altered).)   On February 8, 2011, Reader sent a letter to

Dr. Birch requesting clarification of Plaintiff's Disability Certificate.  Dr. Birch

3

issued another Disability Certificate clarifying Plaintiff's restrictions as follows:

> Minimal ascending & descending of stairs; avoid walking on inclinations; may work 8 hr days 5 times a week; may operate/sit in golf cart for long periods; foot can be elevated on a stool while [patient] seated @ kiosk; foot need not be elevated above head level.

(Doc. 51-7 at 240.)

On February 16, 2011, Plaintiff signed a modified duties list that met Dr. Birch's restrictions.  (Doc. 51-7 at 334.)  For example, Plaintiff was assigned to work at the kiosk computer, which Plaintiff admits did not violate Dr. Birch's restrictions.  (See Doc. 51-7 at 164.)  Plaintiff was further instructed to elevate his foot in the kiosk, the golf cart, and the break room, but was prohibited from using the pavilions to take a break and/or elevate his foot.  Upon Plaintiff's return to work, Defendants moved Plaintiff to a midnight to 8:00 a.m. graveyard shift.  Although Plaintiff requested to have Sundays off to attend church services, Plaintiff's work schedule did not conflict with his church services, and therefore, Defendants denied Plaintiff's request.  Plaintiff was assigned to the same schedule he had prior to his work injury, with Mondays and Tuesdays off.

Plaintiff discussed his modified duties with Dr. Mark K. Lipetz, Plaintiff's treating physician, and on February 24, 2011, Dr. Lipetz modified Dr. Birch's restrictions to limit Plaintiff's standing and walking to a maximum of two hours per shift.  (Doc. 51-7 at 336.)  Dr. Lipetz further instructed Plaintiff to avoid stairs and ascending or descending hills, to avoid lifting over ten pounds, to limit

work shifts to eight hours, and to elevate his foot (above heart height) while sitting. (Id.)  Plaintiff's modified duties with the AOAO did not prohibit him from observing Dr. Lipetz's restrictions, and in order to comply with Plaintiff's work limitations, Plaintiff's coworkers took on additional duties that Plaintiff was unable to perform.

On multiple occasions during 2011 and 2012, Plaintiff requested to switch from graveyard to swing shift.  At some point, Plaintiff discussed the change to swing shift with Dr. Birch, who opined that the swing shift would allow Plaintiff to better recover; however, Dr. Birch did not send anything to Defendants indicating that a change to swing shift should be a part of his modified duties. Defendant Johnson reminded Plaintiff that swing shift patrols required walking around the perimeter of the buildings and conducting security checks on uneven ground while the graveyard shift did not.  Because Plaintiff's work limitations required Plaintiff to avoid walking on uneven ground and limited his walking to a maximum of two hours per shift, Defendants denied Plaintiff's transfer requests.

According to Defendants, Plaintiff was adversarial with his coworkers and supervisors.  On at least two occasions prior to Plaintiff's foot injury, Defendant Johnson had to intervene.  When Plaintiff returned to work in February 2011, he continued his adversarial approach to working with others and began to direct more of his aggression towards Management, and particularly Defendants

5

Reader and Johnson.  At various times, Defendants documented Plaintiff's refusal

to follow AOAO policies and procedures, Plaintiff's poor work performance, and

Plaintiff's insubordination and discourteous conduct towards his supervisors.

(Doc. 51-7 at 260-65.)  Despite the AOAO's continued warnings and identification

of goals to help improve Plaintiff's performance, Plaintiff's performance of his

modified duties did not improve.  Additionally, Plaintiff continued to engage in

disruptive behavior, which ultimately resulted in multiple disciplinary actions,

including probations and suspension.

By 2013, Plaintiff's performance continued to deteriorate.  Plaintiff

failed to properly complete his daily activity reports and incident reports, even

after being instructed to do so.  Plaintiff injected personal issues into his daily

activity reports in violation of AOAO policy, and refused to sign patrol memos

issued by Defendant Johnson on AOAO policies and procedures.

Between August 9 and August 19, 2013, the AOAO managers met to

prepare Plaintiff's annual review.  After consideration of Plaintiff's performance,

attitude, and conduct, the AOAO managers decided to recommend Plaintiff's

termination to the AOAO Board of Directors.  The Board agreed with the AOAO

managers and decided to terminate Plaintiff.

Plaintiff's termination letter states, in relevant part:

This letter is in response to your most recent refusal to follow policies
and procedures.  It is our expectation that all our employees do their

6

basic duties, follow directions and procedures, and work cooperatively with co-workers and management.  Your continued refusal to follow direction and implement business procedures, and, your constant disruption of the workforce has created an untenable working situation.

You have been given every opportunity possible to succeed.  Despite numerous periods of progressive discipline including coaching and counseling, suspension, and, warnings informing you that continued refusal to follow company policy would lead to termination, you repeatedly choose an adversarial position.  After careful consideration and after evaluating your current and your past performance, there is no option but to terminate your employment with Wailea Point Village effective September 3, 2013.

(Doc. 51-7 at 305.)

On July 1, 2014, Plaintiff filed his Complaint alleging claims for (1) Disability Discrimination and Retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, and Hawaii Revised Statutes ("HRS") § 378-2 ("Count I"); (2) Religious Discrimination under Title VII Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Hawaii Revised Statutes § 378-2 ("Count II"); (3) Hostile Work Environment and Retaliation under Title VII Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Hawaii Revised Statutes § 378-2 ("Count III"); (4) Wrongful Discharge and Retaliation under HRS §378-62 Whistleblower's Protection Act ("Count IV"); (5) Wrongful Retaliatory Discharge ("Count V"); (6) Wrongful "Parnar" Discharge in violation of Public Policy ("Count VI"); (7) Negligent Hiring, Retention, Training and/or Supervision ("Count VII"); (8) Negligence ("Count VIII"); (9) Gross Negligence ("Count IX"); (10) Intentional

Infliction of Emotional Distress ("Count X"); (11) Negligent Infliction of

Emotional Distress ("Count XI"); and (12) Respondeat Superior and/or Vicarious

Liability ("Count XII").  (See generally, Doc. 2.)

On September 14, 2015, the Court approved and filed the parties'

stipulation to dismiss with prejudice, Counts VII, VIII, IX and XI.  (Doc. 49.)

Therefore, the only claims that remain against Defendants are those claims set

forth in Counts I, II, III, IV, V, VI, X, and XII.

## STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when the

pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is "no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A main purpose of

summary judgment is to dispose of factually unsupported claims and defenses.

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  Id. at 323.

"A moving party without the ultimate burden of persuasion at trial – usually, but

not always, a defendant – has both the initial burden of production and the ultimate

burden of persuasion on a motion for summary judgment."  Nissan Fire & Marine

Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially

falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings. Porter v. California Dep't of Corrections, 419 F.3d 885, 891 (9th Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motions by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").  At least some significant probative evidence must be produced, T.W. Elec. Serv., 809 F.2d at 630; "[a] scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

At summary judgment, the court must view the evidence in the light

most favorable to the nonmoving party.  <u>T.W. Elec. Service, Inc.</u>, 809 F.2d at 630.

If direct evidence produced by the moving party conflicts with direct evidence

produced by the nonmoving party, the judge must assume the truth of the evidence

set forth by the nonmoving party with respect to that fact.  <u>Id.</u> at 631. Put another

way, if a rational trier of fact might resolve the issue in favor of the nonmoving

party, summary judgment must be denied.  <u>Id.</u>  Moreover, inferences must also be

drawn in the light most favorable to the nonmoving party.  <u>Id.</u>

## <u>DISCUSSION</u>

### I.      Motion for Summary Judgment by AOAO at Wailea Point Village

As a threshold matter, the parties have stipulated to dismiss with

prejudice Counts VII, VIII, IX, and XI of the Complaint, and Plaintiff concedes

Count III in his opposition to Defendant AOAO at Wailea Point Village's

("AOAO") Motion for Summary Judgment.  Accordingly, the only remaining

claims against the AOAO are the claims set forth in Counts I (Disability

Discrimination), II (Religious Discrimination), IV (Wrongful Discharge and

Retaliation under Whistleblower's Protection Act), V (Wrongful Retaliatory

Discharge), VI (Parnar Claim), X (IIED), and XII (Vicarious Liability).

### A.      Disability Discrimination and Retaliation (Count I)

Plaintiff claims disability discrimination, pursuant to the ADA, 42

U.S.C. § 12102 and Hawaii Revised Statutes § 378-2 under two legal theories:  (1)

10

disparate treatment; and (2) failure to accommodate. Plaintiff alleges he suffered a variety of adverse employment decisions because of his disability, including probation, suspension, denial of pay raises and bonuses, and termination. (Doc. 2 at 18.) Plaintiff further alleges that he suffered retaliation after he complained and filed charges of discrimination. (Id.)

### 1. Disparate Treatment

Title I of the ADA, 42 U.S.C. § 12112(a) prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." Pursuant to the ADA, the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]" 42 U.S.C. § 12112(b)(5)(A). Similarly, HRS § 378-2(a)(1)(A) makes it an unlawful discriminatory practice "[f]or any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of a person's disability.

The Court applies the familiar burden-shifting analysis derived from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to claims of

discrimination on account of a disability.  See, e.g., Raytheon Co. v. Hernandez,

540 U.S. 44, 49-50 (2003) (applying the McDonnell Douglas burden shifting

framework to an ADA disability discrimination claim).  Under this burden-shifting

analysis, Plaintiff must first establish a prima facie disability discrimination claim.

See, e.g., Raytheon, 540 U.S. at 49 n.3.  To do so, Plaintiff must put forth evidence

that he:  (1) is "disabled" within the meaning of the ADA; (2) is a "qualified

individual," that is, he is "able to perform the essential functions of his job," with

or without reasonable accommodations; and (3) suffered an adverse employment

action because of his disability.  See, e.g., Samper v. Providence St. Vincent Med.

Ctr., 675 F.3d 1233, 1237 (9th Cir. 2012) (citing 42 US.C. § 12112(a), (b)(5)(A)

(requiring reasonable accommodation)).  At the summary judgment stage, the

requisite degree of proof necessary to establish a prima facie case is minimal and

does not even need to rise to the level of a preponderance of the evidence.  Lyons

v. England, 307 F.3d 1092, 1112 (9th Cir. 2002).  If Plaintiff establishes a prima

facie case of discrimination, the burden then shifts to Defendants to articulate a

legitimate, nondiscriminatory reason for its employment action.  Raytheon, 540

U.S. at 49 n.3.  If Defendants proffer such a reason, "the presumption of intentional

discrimination disappears, but the plaintiff can still prove disparate treatment by,

for instance, offering evidence demonstrating that the employer's explanation is

pretextual."  Id.

### a.    Plaintiff's Prima Facie Case of Discrimination

The parties do not appear to dispute that Plaintiff is disabled and a qualified individual.  Thus, the Court will first address whether Plaintiff suffered an adverse employment action.  Plaintiff maintains that Defendants denied his annual wage increases and bonuses because of his disability.  Plaintiff states that before he got injured, he had always received annual wage raises of $0.50 a year; however, after he returned to work from his medical leave, he did not receive any wage raises in 2011, 2012, and 2013.  Plaintiff further states that Defendants refused to give him a Christmas bonus in 2010, 2011, 2012, and 2013 due to his work-related disability.  Plaintiff argues that in 2011, while most of the full-time employees got Christmas bonuses of more than $2,000, Plaintiff received only $549.  Plaintiff argues that in 2012, most of the full-time employees received over $2,000 in Christmas bonuses, while Plaintiff received less than $200 due to his suspension in July 2012.  In 2013, Plaintiff did not get any bonus because he was terminated in September 2013.

The Ninth Circuit defines "adverse employment actions" broadly.  Ray v. Henderson, 217 F.3d 1234, 1241 (9th Cir. 2000).  The Ninth Circuit has recognized that an adverse employment action exists where an employer's action negatively affects its employee's compensation.  Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 847 (9th Cir. 2004).  In construing the evidence in the

light most favorable to Plaintiff, the Court finds that the evidence shows Plaintiff was adversely and disparately treated.  Inasmuch as the evidence described supports an inference of disparate treatment, the burden shifts to Defendants to articulate a legitimate nondiscriminatory reason for the adverse employment actions taken.  Raytheon, 540 U.S. at 49 n.3.

### b.   Defendants' Legitimate Nondiscriminatory Reasons for its Employment Action

Defendants articulate a variety of legitimate nondiscriminatory reasons for the employment actions taken against Plaintiff.  First, Defendants indicate that pay raises are evaluated annually, are not automatic, and instead, the decision to award a pay raise is based on a number of factors, including employee performance over the previous year.  (Doc.53-1 at 2, ¶ 8.)  Defendants indicate that Plaintiff did not receive a wage increase from 2010-2013 because his performance did not warrant it.  (Doc. 53-1 at 2, ¶ 8.)  The evidence suggests that when Plaintiff returned to work in February 2011, he directed more aggression toward management, he failed to perform his modified work duties, and he engaged in disruptive behavior that resulted in multiple disciplinary actions.  (Id. at 6.) Defendants also present evidence suggesting that Plaintiff's performance continued to deteriorate in 2013 when he failed to perform his modified duties, including the completion of daily activity and incident reports.  (Id. at 8.)  Defendants further indicate that by mid-2013, Plaintiff engaged in blatant misconduct and/or

14

insubordination, injected personal issues into his daily activity reports against

AOAO policy, refused to sign patrol memos, and continued to fail to perform his

modified duties.  (Id. at 9.)  These issues are confirmed in various letters to

Plaintiff from the AOAO, dated from September 8, 2011 through July 10, 2012.

These letters outline the reasons for the denial of Plaintiff's wage increases and the

reasons various disciplinary actions were taken against Plaintiff, and further

indicate goals for Plaintiff to reach in order to improve his work performance.

(See Doc. 53-10 at 289-96.)

            As to the matter of bonuses, the AOAO indicates that it uses a

formula-based system to calculate annual employee bonuses, which was

distributed to all employees, including Plaintiff, in 2008.  (Doc. 53-1 at 2-3, ¶ 9.)

The stated policy provides a formula that takes into account many factors,

including the amount of unpaid leave taken for any reason during the calendar

year.  (Id.; see also Doc. 53-4)  The policy further provides that employees who are

not employed within 15 calendar days of bonus disbursement, which occurs at the

end of every year, do not receive a bonus.  (Doc. 53-1 at 2-3, ¶ 9; Doc. 53-4.)

Additionally, under the policy, "[e]mployees who utilized leave without pay,

because they have no more sick or vacation time, will be paid out on a percentage

basis."  (Doc. 53-4.)  Under the bonus policy, employees with over five years of

service are entitled to a $600 bonus.[1]  (Doc. 53-4.)  Inasmuch as Plaintiff was out

of work from July 2010 through February 2011, under the stated bonus policy,

Plaintiff was not employed within 15 calendar days of a bonus disbursement, and

therefore, was not entitled to a bonus in 2010.  Additionally, because Plaintiff was

terminated in September 2013, the same policy would apply to bar Plaintiff's 2013

bonus.  With regard to Plaintiff's 2011 bonus, Plaintiff maintains he received "only

$549," which appears to be $51 less than the maximum bonus he would otherwise

be entitled too.  Given that Plaintiff missed a substantial amount of work in the

beginning of the year, it is reasonable to conclude that his 2011 bonus was partly

reduced.  In regards to the 2012 bonus, Plaintiff acknowledges that his bonus was

less than $200, "because of his suspension in July."  (Doc. 81 at 8.)

       The evidence in the record demonstrates that Plaintiff had a lengthy

history of performance issues, which ultimately led to his termination.  He was

placed on probation in 2011 for failing to perform his modified duties, making

inappropriate comments to co-workers, and bullying his supervisor.  Plaintiff's

probation was extended when he failed to improve his performance or meet the

goals the AOAO set for him when his probation first began.  In 2012, Plaintiff was

suspended and again placed on probation after he was observed sleeping on the

job.  Although he was given an opportunity to improve, his job performance

---

[1] The record indicates that Plaintiff's five-year work anniversary with the AOAO happened on or about September 8, 2011.  (See Doc. 53-10 at 289.)

16

worsened.  In short, the evidence reflects that Plaintiff was progressively

disciplined and terminated for poor work performance and insubordination.

The Court finds that Defendants have articulated legitimate

nondiscriminatory reasons for declining to award Plaintiff annual pay raises, for

declining or reducing Plaintiff's annual bonuses, and for terminating him.  Because

Defendants have proffered such reasons, "the presumption of intentional

discrimination disappears[.]"  Raytheon, 540 U.S. at 49 n.3.  However, under the

McDonnell Douglas burden-shifting test, Plaintiff may still prove disparate

treatment by, for instance, "offering evidence demonstrating that the employer's

explanation is pretextual."  Id.

### c.    Pretext

A plaintiff can prove pretext "(1) indirectly, by showing that the

employer's proffered explanation is unworthy of credence because it is internally

inconsistent or otherwise not believable, or (2) directly, by showing that unlawful

discrimination more likely motivated the employer."  Raad v. Fairbanks N. Star

Borough Sch. Dist., 323 F.3d 1185, 1194 (9th Cir. 2003) (internal quotation marks

and citation omitted).  The Ninth Circuit has held that very little evidence is

necessary to raise a genuine issue of fact regarding an employer's motive, and "any

indication of discriminatory motive may suffice to raise a question that can only be

resolved by a fact-finder."  Nicholson v. Hyannis Air Serv., Inc., 580 F.3d 1116,

1127 (9th Cir. 2009).  "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment."  Bergene v. Salt River Project Agric. Improvement & Power Dist., 272 F.3d 1136, 1142 (9th Cir. 2001).

Plaintiff argues that Defendants' proffered reasons are not reasonable and are instead a pretext for discrimination.  In support of this contention, Plaintiff states that he was a good patrol officer who had outstanding performance reviews prior to his injury and for which he was awarded annual wage raises.  (Doc. 81 at 9.)  Plaintiff further contends that the "plain simple truth" is that Defendants did not want to accommodate him and were "hell-bent on finding a way to get him to quit so that they would not have to fire him and pay him unemployment benefits."  (Id.)  Apart from his own assertions regarding his performance, Plaintiff does not offer any evidence suggesting that Defendants' refusal to award him annual pay raises and bonuses was based on a discriminatory motive.  He also does not provide any counter evidence to the AOAO's assertions concerning Plaintiff's declining work performance.  Accordingly, the Court grants summary judgment on Plaintiff's disability discrimination claim in favor of Defendants.

### 2.    Failure to Accommodate

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The ADA

further defines "discriminate" as including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]"  42 U.S.C. §12112(b)(5)(A).  EEOC regulations further define the term reasonable accommodation to include "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."  29 C.F.R. § 1630.2(o)(1)(iii).

   "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations."  Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001) (citation omitted); see also 29 C.F.R. § 1630.2(o)(3) (explaining that the interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations").  The interactive process requires "(1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3)

offering an accommodation that is reasonable and effective." <u>Zivkovic v. S. Cal. Edison Co.</u>, 302 F.3d 1080, 1089 (9th Cir. 2002).  An employer is not obligated to provide an employee the accommodation he requests or prefers; the employer need only provide some reasonable accommodation.  <u>Id.</u>  EEOC interpretive guidance states that "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." <u>U.S. EEOC v. UPS Supply Chain Solutions</u>, 620 F.3d 1103, 1110 (9th Cir. 2010) (citing Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. Part 1630, App., 56 Fed. Reg. 35,726-01, 35,749 (July 29, 1991)).

        Defendants' duty to engage in the interactive process includes not only a discussion of Plaintiff's requested accommodation, but also a continuing discussion to explore available alternatives when the requested accommodation is ineffective or too burdensome.  <u>See</u> <u>Humphrey v. Memorial Hospitals Ass'n</u>, 239 F.3d 1128, 1138 (9th Cir. 2001).  An employer who fails in good faith to engage in an interactive process is liable under the ADA "if a reasonable accommodation without undue hardship to the employer would otherwise have been possible." <u>Humphrey</u>, 239 F.3d at 1139 (citation omitted).  Moreover, an employer who fails to engage in an interactive process in good faith is not entitled to summary judgment unless "a reasonable finder of fact must conclude that 'there would in

any event have been no reasonable accommodation available.'"  Dark v. Curry

Cnty., 451 F.3d 1078, 1088 (9th Cir. 2006) (citation omitted).  On the other hand,

however, liability for failure to provide reasonable accommodations ensues only

where the employer bears the responsibility for the breakdown in the interactive

process.  Zivkovic, 302 F.3d at 1089; see also Allen v. Pacific Bell, 348 F.3d 1113,

1114-15 (9th Cir. 2003) (providing that where an employee fails to cooperate in

the interactive process, but the employer is actively engaged in the process, the

employer is not liable).

On February 15, 2011, Plaintiff provided a disability certificate to

Defendants.  (Doc. 2 at 7, ¶ 27.)  The disability certificate restricted and/or limited

Plaintiff to no standing over two hours per day, no walking over two hours per day,

no lifting over ten pounds, and no working over eight hours per day, subject to

special instructions including minimal ascending and descending of stairs, and to

avoid walking on inclinations.  (Doc. 2 at 7-8, ¶ 31; Doc. 53-10 at 276.)  Further

disability certificates contained in the record apparently extended Plaintiff's work

restrictions through, at least, December 31, 2012.  (Doc. 53-10 at 356, 362.)

By letter dated February 8, 2011, the AOAO sent a letter to Plaintiff

to clarify the number of hours Plaintiff could work and the specific restrictions

contained in the disability certificate.  (Doc. 53-10 at 277.)  The letter expressly

stated the AOAO's intention to "modify [Plaintiff's] schedule in accordance to

[his] doctor's specifications."  (Id.)  A "Modified Duties" letter, dated February 16,

2011, was issued by the AOAO providing Plaintiff's work modifications in order

"to accommodate his physician's guidelines to return to work at a modified

capacity."  (Doc. 53-10 at 342.)  Plaintiff concedes that he reviewed the modified

duties letter with Defendants and signed the letter.  Thus, it appears from the

record that that when Plaintiff returned to work in February 2011, he was assigned

modified duties in accordance with the restrictions outlined in his disability

certificates.  Plaintiff provides no evidence to the contrary.

        A further disability certificate, dated September 17, 2012, indicated

that Plaintiff would need modified work duties in relation to a "chronic wound

[right] foot."  (Doc. 53-10 at 362.)  By letter dated October 10, 2012, the AOAO

requested Dr. Birch to provide further information related to Plaintiff's right foot

disability, and to help identify a reasonable accommodation for his condition.

(Doc. 53-10 at 366-68.)  Plaintiff testified at his deposition that Dr. Birch refused

to respond to the letter or otherwise provide information to the AOAO.  (Doc. 53-

10 at 210.)  To the extent Plaintiff and his treating physician refused to respond to

the AOAO's October 10, 2012 request to engage in an interactive process to

explore reasonable accommodations for Plaintiff's disability, the AOAO will not

be liable for failing to provide accommodation.  See Allen, 348 F.3d at 1114-15

(providing that where an employee fails to cooperate in the interactive process, but

the employer is actively engaged in the process, the employer is not liable).

In sum, the Court finds that the AOAO provided Plaintiff with modified duties following his return to work in February 2011 due to his left foot injury.   With regard to the September 17, 2012 disability certificate, the Court finds that the AOAO is not responsible for the breakdown of the interactive process.   Accordingly, the AOAO is entitled to summary judgment on Plaintiff's claim for failure to provide reasonable accommodation for his disability.

**B.     Religious Discrimination (Count II)**

In Plaintiff's Count II claim for religious discrimination under Title VII Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Hawaii Revised Statutes § 378-2, Plaintiff alleges he was denied time-off from work to attend church services.  (Doc. 2 at 19.)  Title VII makes it an unlawful employment practice for an employer "to discharge any individual . . . because of such individual's . . . religion."  42 U.S.C. § 2000e–2(a)(1).  Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

The Ninth Circuit Court has established a two-part framework to analyze Title VII religious discrimination claims:

First, the employee must establish a prima facie case by proving that (1) he had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer threatened him with or subjected him to discriminatory treatment, including discharge, because of his inability to fulfill the job requirements.

Heller v. EBB Auto Co., 8 F.3d 1433, 1438 (9th Cir. 1993).  Second, if the employee proves a prima facie case of discrimination, the burden shifts to the employer to establish that it initiated good faith efforts to accommodate the employee's religious practices.  Id.

Plaintiff contends he was denied time-off from work to attend church services, which were offered only on Sunday mornings.  (Doc. 2 at 19.)  Upon his return to work in February 2011, Plaintiff requested Sundays off in order to attend church.  (Doc. 53-10 at 223.)  Plaintiff also requested to switch to the "swing shift" in order to allow him "more freedom to attend church and other church functions." (Doc. 53-10 at 353.)  In his deposition, Plaintiff said that he attended services at four different churches.  Plaintiff clarified that as a practitioner of the Lutheran faith, he is required to attend Sunday services, and services are not held on any other day of the week.  (Doc. 53-10 at 67.)  Plaintiff further testified that with the exception of one church, the other churches he attended offered multiple services at different times of the day and that he attended church services at different times depending on his work schedule.

The term "reasonable accommodation" is a relative term and cannot

24

be given a hard and fast meaning.  The Ninth Circuit has generally recognized that employees do not have "[a]n inflexible duty to reschedule" their religious ceremonies.  Heller, 8 F.3d at 1439.  In a case such as this, however, where an employee maintains that his religious beliefs require him to attend church at a specific time, he must prove that the temporal mandate was part of his bona fide religious belief.  See Tiano v. Dillard Dept. Stores, Inc., 139 F.3d 679, 682 (9th Cir. 1998).  The evidence offered by Plaintiff fails to do so.  Instead, the record shows that church services were available at different times of the day and Plaintiff had been able to attend church despite his work schedule.  Although Plaintiff stated that he "preferred to attend the 7:00 a.m. church," (Doc. 80 at 5), Plaintiff's need to attend church was not in conflict with his employment duties.  Thus, the Court finds that Plaintiff is unable to satisfy a crucial element of his prima facie case, i.e., a conflict between his religious belief and his employment duties.  In the absence of a prima facie case, the AOAO cannot be liable for religious discrimination under Title VII.  Accordingly, the Court grants summary judgment in favor of Defendants on this claim.

### C.   Wrongful Discharge and Retaliation under HRS § 378-62, Hawaii Whistleblower's Protection Act (Count IV)

Plaintiff also alleges that the AOAO's termination of Plaintiff was in retaliation for reporting security violations and reporting numerous violations of occupational safety laws to the Hawaii Occupational Safety and Health Division

("HIOSH").  (Doc. 2 at 21.)  The AOAO seeks summary judgment on Plaintiff's

Count IV Hawaii Whistleblower's Protection Act ("HWPA") claim on the basis

that Plaintiff's claim has no merit.

> Section 378-62 of the HWPA states in relevant part:
>
> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> > (1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
> >
> > > (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States; or
> > >
> > > (B) A contract executed by the State, a political subdivision of the State, or the United States[.]

HRS § 378-62.  Although the HWPA itself does not explicitly define the elements

of a claim under § 378-62, three elements can be extrapolated from the language of

the statute, together with the Hawaii Supreme Court's interpretation of claims

under § 378-62.  See Crosby v. State Dept. of Budget & Fin., 876 P.2d 1300, 1310

(Haw. 1994), cert. denied, 513 U.S. 1081 (1995); see also Nelson v. Nat'l Car

Rental System, Inc., Civ. No. 05-00374 JMS-LEK, 2006 WL 1814341, at *3 (D.

Haw. June 30, 2006).  First, there must be a showing that the employee "engaged

in protected conduct" as it is defined by the HWPA.  Crosby, 876 P.2d at 1310.

Second, the employer is required to take some adverse action against the employee.  Id.  Third, there must be "a causal connection between the alleged retaliation and the 'whistleblowing.'"  Id.  In other words, to meet the causal connection requirement, "[the] employer's challenged action must have been taken 'because' the employee engaged in protected conduct."  Id.

### 1.     Protected Conduct & Adverse Action

Plaintiff alleges that he was discharged because he reported numerous violations of occupational safety laws to HIOSH.  (Doc. 2 at 21.)  Plaintiff made his first HIOSH claim in July 2012, alleging safety hazards at Wailea Point. Pursuant to HRS § 378-62, in the reporting of suspected violations of occupational safety laws is protected conduct.  Moreover, it is uncontested that sometime after Plaintiff made his HIOSH claim in July 2012, he was terminated from employment with the AOAO.  Accordingly, the Court finds that the evidence, when viewed in the light most favorable to Plaintiff, has satisfied the first and second elements of Plaintiff's HWPA claim.  Thus, the only remaining issue is whether Plaintiff has shown he was terminated for his reporting of suspected violations.

### 2.     Causal Connection

As noted above, the third element of a HWPA claim requires "a causal connection between the alleged retaliation and the 'whistleblowing.'" Crosby, 876 P.2d at 1310; see also U.S. ex rel. Lockyer v. Hawaii Pacific Health,

490 F. Supp. 2d 1062, 1087 (D. Haw. 2007).  To meet the causal connection

requirement, "[the] employer's challenged action must have been taken 'because'

the employee engaged in protected conduct[.]"  Crosby, 876 P.2d at 1310.  Here,

the only evidence Plaintiff presents to establish a causal connection between his

termination and his 2012 HIOSH complaint is his own assertion that Defendant

Johnson knew about the complaint because he told Plaintiff "to come to him next

time he comes across a violation."  (Doc. 81 at 14; Doc. 80 at 6.)  This alone, is

insufficient to support a causal connection.

Plaintiff first filed a complaint with HIOSH in July 2012.  Over one

year later, on September 3, 2013, Plaintiff was terminated.  Following his

termination, in February 2014, Plaintiff also filed a charge of discrimination with

the Hawaii Civil Rights Commission ("HCRC") and the Equal Employment

Opportunity Commission ("EEOC").  There is no evidence in the record to suggest

that Defendants terminated Plaintiff due to his complaints with HIOSH or the

HCRC and EEOC.  First, Defendants contend that the July 2012 HIOSH complaint

came to the AOAO as an anonymous complaint and that neither HIOSH nor

Plaintiff informed the AOAO who had made the complaint.  This is confirmed by

two letters, one from HIOSH to Plaintiff, dated August 7, 2012, and another letter

from HIOSH to the AOAO, dated August 6, 2012, which omit Plaintiff's name and

any personal identifiers.  See HRS §396-8(e)(2) ("Upon discretion of the director

or request, names of complainants may be withheld from the employer[.]").

Second, Plaintiff was terminated over a year after his first complaint, and before Plaintiff made his second complaint, which suggests that Plaintiff's complaints were not a substantial or motivating factor in the AOAO's decision to terminate Plaintiff.  See Griffin v. JTSI, Inc., 654 F. Supp. 2d 1122, 1132-33 (D. Haw. 2008) (holding that "proximity in time is one type of circumstantial evidence that is sufficient on its own to meet the plaintiff's burden," and finding that a reasonable trier of fact could infer that Plaintiff's termination, which occurred two days after he engaged in a protected activity, raised questions of fact as to whether Plaintiff's conduct played a role in his termination).  Accordingly, even when viewed in the light most favorable to Plaintiff, the Court finds that Plaintiff fails to establish a causal connection between the filing of his complaints and his termination.  See Crosby, 876 P.2d at 1310.

### 3.   Defendants' Legitimate Reasons Support Plaintiff's Termination

"[A]s an affirmative defense the employer may show by a preponderance of the evidence that the employee would have been terminated even in the absence of the protected conduct."  NLRB v. Searle Auto Glass, Inc., 762 F.2d 769, 773 (9th Cir.1985); see also Nabors Alaska Drilling, Inc. v. NLRB, 190 F.3d 1008, 1015 (9th Cir. 1999) (holding that once the employee makes its prima facie showing, "[t]he burden then shifts to the employer to prove that legitimate

reasons supported the termination").

Even assuming Plaintiff is able to establish a causal connection between the filing of his HIOSH and HCRC/EEOC complaints and his eventual termination, the Court finds that Defendants have established that Plaintiff's termination would have occurred regardless of the protected activity.  Plaintiff's termination letter is replete with examples why Plaintiff was terminated, including Plaintiff's "continued refusal to follow directions and implement business procedures," his "constant disruption of the workforce," and his "continued refusal to follow company policy."  (Doc. 53-10 at 334.)  In support of the allegations raised in Plaintiff's September 3, 2013 termination letter, the AOAO also provides various anniversary review letters outlining challenges regarding Plaintiff's performance and goals to help him improve performance, as well as letters outlining why various disciplinary measures were taken.  (See, e.g., Doc. 53-10 at 289, 291, 294.)  The overwhelming weight of the evidence in the record supports Defendants' argument that Plaintiff was terminated for performance-related issues, and not due to the filing of Plaintiff's complaints.  Accordingly, the Court finds that the AOAO has established legitimate reasons supporting Plaintiff's termination and grants summary judgment in favor of the AOAO on this claim.[2]

_____

[2]  Plaintiff's Count V Wrongful Retaliatory Discharge claim is based on the same conduct as his Count IV claim for Wrongful Discharge and Retaliation under the Hawaii Whistleblower's Protection Act, and therefore, the Court similarly grants summary judgment on this claim for the

### D.     Wrongful "Parnar" Discharge in Violation of Public Policy (Count VI)

Plaintiff alleges a claim of wrongful termination in violation of public policy based on the same allegations supporting his discrimination claims.  The AOAO seeks summary judgment on Plaintiff's Count VI claim on the grounds that Hawaii does not recognize an independent claim for violation of public policy where the conduct at issue is based on conduct prohibited by Title VII or by HRS § 378.  (Doc. 52-1 at 42.)

In Parnar v. Americana Hotels, Inc., 652 P.2d 625 (Haw. 1982), the Hawaii Supreme Court recognized the common law tort of wrongful discharge in violation of public policy.  The Parnar Court held that an "employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy."  Parnar, 652 P.2d at 631.  In order to determine "whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitution, statutory, or regulatory provision or scheme."  Id.  Such claim, however, cannot stand where a statute provides a sufficient remedy for the violation:

> [A Parnar claim was] intended to apply to a "narrow class of cases"
> where the wrongful discharge action is seen as necessary to effectuate

---

reasons and authorities set forth above.  To the extent Plaintiff also argues that he was wrongfully discharged due to his refusal to complete written reports, the Court finds that Plaintiff has failed to establish that the refusal to complete written reports is a protected activity.  Instead, the Court finds that such activity was part of Plaintiff's employment responsibilities, and therefore, does not serve as a basis for this type of claim.

the public policy at stake.  **If, however, the statutory or regulatory provisions which evidence the public policy themselves provide a remedy for the wrongful discharge, provision of a further remedy under the public policy exception is unnecessary**.  If the legislature has considered the effect of wrongful discharge on the policies which they are promoting, provision by the courts of a further remedy goes beyond what the legislature itself thought was necessary to effectuate that public policy.

Ross v. Stouffer Hotel Co., 879 P.2d 1037, 1047 (Haw. 1994) (quoting Lapinad v. Pac. Oldsmobile–GMC, Inc., 679 F. Supp. 991, 993 (D. Haw. 1988)) (emphasis added).

Title VII and HRS § 378 expressly prohibit workplace discrimination because of disability and/or religion, and courts have found that as a result, a plaintiff cannot state a Parnar claim based on the same conduct.  See, e.g., Lapinad, 679 F. Supp. at 993 ("Thus, even though Title VII is not an exclusive remedy, in that it does not abrogate remedies which already existed, it does not create an additional common law remedy beyond the specific remedies contained in the statute.").

Accordingly, Plaintiff cannot state a claim for wrongful termination in violation of public policy based on the same conduct as his Title VII and HRS § 378 claims because these statutes already provide a sufficient remedy. Accordingly, the Court grants the AOAO's motion for summary judgment as to Count VI of the Complaint.

32

E.     IIED (Count X)

In order to show intentional infliction of emotional distress in Hawaii, a plaintiff must prove "1) that the act allegedly causing harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." Hac. v. Univ. of Hawaii, 73 P.3d 46, 60-61 (Haw. 2003). To defeat a motion for summary judgment on a claim for IIED, a plaintiff must show that the defendant's actions were outrageous, unreasonable, or "without just cause or excuse and beyond all bounds of decency[.]" Chedester v. Stecker, 643 P.2d 532, 535 (Haw. 1982); see also Nagata v. Quest Diagnostics Inc., 303 F. Supp. 2d 1121, 1127 (D. Haw. 2004) (holding that in Hawaii, a plaintiff must establish that the defendant's alleged conduct was "outrageous" as defined by the Restatement (Second) of Torts, in order to prevail with his IIED claim). The Restatement provides:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46, cmt. D (1965).

"The question whether the actions of the alleged tortfeasor are . . . outrageous is for the court in the first instance, although where reasonable persons may differ on that question it should be left to the jury." Shoppe v. Gucci America, Inc., 14 P.3d 1049, 1068 (Haw. 2000).  In evaluating the sufficiency of a claim for intentional infliction of emotional distress, the court is to evaluate the facts pleaded in support of the claim, and "determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." Lapinad, 679 F. Supp. at 996 (citing Salazar v. Furr's, Inc., 629 F. Supp. 1403, 1411 (D. N.M. 1986)). "Complaints which have been held to properly sustain a claim for intentional infliction of emotional distress have generally included allegations of actions which go beyond simple unfairness or insensitivity." Kalawe v. KFC Nat'l Management Co., Civ. No. 90-00779 ACK, 1991 WL 338566, at *5 (D. Haw. 1991).

Here, the Court does not find that the Defendants' conduct with respect to the employment actions taken against Plaintiff may reasonably be regarded as so extreme and outrageous such as to permit Plaintiff's recovery for IIED.  Lapinad, 679 F. Supp. at 996.  Defendants' alleged conduct is not "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>See</u> Restatement (Second) of Torts § 46, cmt. D. Accordingly, the Court grants the AOAO's motion for summary judgment on Plaintiff's Count X IIED claim.

### F.    Vicarious Liability (Count XII)

Lastly, the AOAO requests summary judgment on Plaintiff's Count XII Vicarious Liability claim.  "Under the theory of respondeat superior, an employer may be liable for the negligent acts of its employees that occur within the scope of their employment."  <u>Freeland v. Cnty. of Maui</u>, Civ. No. 11-00617 ACK-KSC, 2013 WL 6528831, at *25 (D. Haw. Dec. 11, 2013).  However, "[r]espondeat superior is not itself a cause of action or a cognizable legal claim," <u>Prunte v. Universal Music Group</u>, 484 F. Supp. 2d 32, 43 (D. D.C. 2007), rather, "it is a method by which to prove another claim."  <u>McCormack v. City & Cnty. of Honolulu</u>, Civ. No. 10-00293 BMK, 2014 WL 692867, at *2 (D. Haw. Feb. 20, 2014) (citations omitted).

For the reasons discussed above, the Court grants summary judgment with respect to Plaintiff's IIED claim against the AOAO.  Accordingly, there are no underlying tort claims against the AOAO, and given that respondeat superior is not a stand-alone claim for relief that can be asserted, the Court dismisses the claim for respondeat superior against the AOAO.

**II**.     **Motion for Summary Judgment by Robert Reader and Darrell Johnson**

As a threshold matter, Plaintiff clarifies in his opposition to

Defendants Reader and Johnson's Motion for Summary Judgment that he does not

oppose the motion as to Count I (ADA and HRS § 378-2), Count II (Religious

Discrimination under Title VII and HRS §378-2); Count III (Hostile Work

Environment and Retaliation under Title VII and HRS § 378-2); Count IV

(Wrongful Discharge and Retaliation under Hawaii's Whistleblower's Protection

Act); Count V (Wrongful Retaliatory Discharge); and Count VI (Wrongful

"Parnar" Discharge) as they relate to Defendants Reader and Johnson.   (Doc. 78 at

2.)  Plaintiff opposes Defendants Reader and Johnson's Motion for Summary

Judgment only as to Count X (Intentional Infliction of Emotional Distress), on the

basis that Defendants Reader and Johnson engaged in willful, wanton, reckless,

outrageous, and extreme acts.

Defendants Reader and Johnson argue they are entitled to summary

judgment on Plaintiff's IIED claim because it is barred by the Hawaii's Workers'

Compensation exclusivity provision.  (Doc. 50-1 at 33.)  Defendants additionally

maintain that even if Plaintiff's claim is not barred, Defendants Reader and

Johnson do not fall under the exception to co-employee liability under HRS § 386-

8 because Plaintiff has failed to show any extreme and outrageous conduct by

Defendants.  For the reasons discussed above in regard to the AOAO's Motion for

Summary Judgment, the Court similarly finds that Plaintiff has failed to establish a prima facie claim for IIED against Defendants Reader and Johnson.

### A.    Hawaii's Workers' Compensation Exclusivity Provision Does Not Bar Plaintiff's IIED Claim

As a general rule in Hawaii, workers' compensation is an injured employee's exclusive remedy for an injury arising out of and in the course of employment.  The exclusivity provision of Hawaii's workers' compensation law extends immunity to both the employer and co-employees acting within the scope of their employment.  HRS §§ 386-5, 386-8.  The Hawaii Supreme Court has held that while the workers' compensation scheme bars a civil action for physical and emotional damages resulting from work-related injuries and accidents, claims based on alleged intentional conduct of an employer are not barred.  Furukawa v. Honolulu Zoological Society, 936 P.2d 643 (1997); see also HRS § 386-5 (stating an exception from the statute's general exclusivity provision for "sexual harassment or sexual assault **and infliction of emotional distress** or invasion of privacy related thereto, in which case a civil action may also be brought" (emphasis added)).   The Hawaii Supreme Court found that claims based on intentional conduct are not based on "accidents" related to the employment, and therefore do not fall within the confines of the workers' compensation scheme. Furukawa, 936 P.2d at 654; see also Black v. City & Cnty. of Honolulu, 112 F. Supp. 2d 1041, 1047 (D. Haw. 2000) (determining that the exception for infliction

37

of emotional distress in HRS § 386-5 includes both negligent and intentional

infliction of emotional distress).  Accordingly, Plaintiff's claim for intentional

infliction of emotional distress is not barred by Hawaii's Workers' Compensation

Act.  Nonetheless, as explained below, Plaintiff failed to produce sufficient

evidence to create a triable issue on the merits of his claim for IIED.

### B.     Exception to Co-Employee Liability for Willful and Wanton Misconduct

While co-employees are generally shielded from liability for a fellow

employee's personal injury, HRS § 368-8 provides for co-employees liability to

the extent a fellow employee's personal injury is caused by the injuring

employees' "wilful and wanton misconduct."  HRS § 386-8.  Inasmuch as all of

the alleged acts which form the basis for Plaintiff's IIED claims against

Defendants Reader and Johnson were committed in the course of Defendants'

employment as managers for the AOAO, Count X should be dismissed unless HRS

§ 386-8's "wilful and wanton misconduct" exception to co-employee immunity

applies.  HRS § 386-8; Wangler v. Hawaiian Elec. Co., 742 F. Supp. 1465, 1468

(D. Haw. 1990) ("[A]lthough the exclusivity provision of Hawaii's workers

compensation law extends immunity to co-employees acting within the scope of

their employment, it does not relieve co-employees of liability to the extent that a

fellow employee's personal injury is caused by their 'wilful and wanton

misconduct.'").  The Hawaii Supreme Court in Iddings v. Mee-Lee explained that

the term "willful and wanton misconduct" as used in HRS § 386-8, refers to

conduct that is either

> (1) motivated by an actual intent to cause injury; or (2) committed in
> circumstances indicating that the injuring employee (a) has knowledge
> of the peril to be apprehended, (b) has knowledge that the injury is a
> probable, as opposed to a possible, result of the danger, and (c)
> consciously fails to avoid the peril.

919 P.2d 263, 274 (Haw. 1996).

To support his claims against Defendants Reader and Johnson,

Plaintiff refers to the adverse employment actions they took against him, including

placing him on probation and suspension, and allegedly refusing to accommodate

his disability and religious beliefs.  He maintains that Defendants Reader and

Johnson were motivated by a desire to cause Plaintiff to fail and quit his job, and

that the actions of these defendants, taken in their totality, constitute willful and

wanton misconduct.  However, Plaintiff fails to provide any evidence to raise a

triable issue on the merits of his IIED claim.  Uncorroborated allegations regarding

employment decisions, standing alone, do not amount to extreme or outrageous

conduct.  Plaintiff has not shown that Defendants Reader and Johnson's conduct

was willful or wanton, or intended to cause Plaintiff emotional distress.

Accordingly, the Court grants summary judgment in favor of Defendants Reader

and Johnson on Count X of Plaintiff's Complaint.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants'

Motions for Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 31, 2016.



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

Turner v. AOAO of Wailea Point Village, et al.; Civ. No. 14-00306 BMK; ORDER GRANTING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.